UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAYMOND P. BUDO,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      Case No. 4:12CV187 JAR
                                          )                      (TIA)
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves an Application for Disability Insurance Benefits.  Claimant has filed a

Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of his Answer.

Procedural History

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final

decision denying Raymond Budo's application for disability insurance benefits under Title II of the

Social Security Act, 42 U.S.C. § 401 et seq.  On March 31, 2006, Claimant Raymond Budo filed

the current application for Disability Insurance Benefits alleging a disability onset date of June 30,

2005, the alleged date of disability.  Claimant brings this action asserting that he is disabled

because he suffers coronary artery disease, advanced stable angina, non-insulin dependent

diabetes, depression, and post-traumatic stress disorder.  The Social Security Administration

denied Claimant's application at the initial level on August 1, 2006, and Claimant filed a timely

hearing request. Claimant appeared and testified at a hearing held on October 31, 2007. The Administrative Law Judge ("ALJ") issued an opinion on December 17, 2007 upholding the denial of benefits. On February 8, 2008, Budo requested that Appeals Council of the Social Security Administration review the ALJ's decision. The Appeals Council denied Budo's request on August 17, 2009. Claimant filed his first appeal on October 2, 2009.

Because the ALJ's assessment of Claimant's residual functional capacity was not supported by substantial evidence, the Honorable Catherine Perry, United States District Judge, reversed the ALJ's unfavorable hearing decision and remanded to the Commissioner for further consideration on December 6, 2010. In relevant part, Judge Perry found the ALJ failed to explain adequately why he gave less weight to the opinions of the treating physicians.

Upon remand, the Appeals Council remanded the case to the ALJ. (Tr. 870-72). On December 7, 2011, the ALJ held a supplemental hearing. (Tr. 795-816). Claimant testified and was represented by counsel. (Id.). Vocational Expert Delores Gonzalez also testified at the hearing. (Tr. 814-16, 936-39). Thereafter, on December 12, 2011, the ALJ issued a decision finding Claimant disabled as of August 4, 2010, but not disabled before that date. (Tr. 778-94). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

<u>Testimony Before the ALJ on October 31, 2007</u>

Claimant testified that he had previously worked as a sales and marketing manager for the cable industry and as a children's photographer for a photo lab. Much of his work involved door-to-door sales as well as supervising other salespeople working in the field. He stopped working in 2005 because he was having chest pains, felt sick and tired constantly, and was sleeping from

twelve to fourteen hours per day. Claimant testified that he had open-heart surgery in 1997 and, in July 2005, the placement of a cardiac catheter and stent. Claimant stated that he had additional stenting done in 2006 and balloon dilation in August of 2006. Claimant further testified that one artery will remain clogged and there are no additional procedures that can alleviate it.

At the time of the hearing, Claimant testified that he had chest pains at all times, for which he was given Isosorbide and Ranexa. When his chest pains become severe, he takes sublingual nitroglycerine, which usually alleviated the pain. If three nitroglycerines would not alleviate his pain, he stated that he went to the emergency room. He estimated that he usually took six to eight sublingual nitroglycerines per week. Claimant further stated that he usually did not have chest pain when sitting on the couch, but found sitting with his legs down to be stressful. He testified that he could stand for only fifteen minutes without having to rest and had to stop and rest when walking up or down a flight of stairs. In order to walk without chest pain, he testified that he has to walk at a very slow pace. Claimant claimed to be fatigued all the times, which had gotten progressively worse since he ceased working in 2005. He testified that in an eight hour period after awaking in the morning, he sleeps or rests for three to four hours and he was unable to make it through a whole day without doing so. He could no longer tolerate direct sun exposure or long periods of time outdoors.

Claimant further testified that he was diagnosed with sleep apnea in 2006, for which he was given a sleep machine and Trazodone, both of which have greatly alleviated his sleep difficulties.

Claimant also indicated in his testimony that he suffered from depression. He saw a psychiatrist every three months and was given some drugs for his depression. Claimant testified

that the therapy made him feel that he no longer wants to die, but he still has difficulty concentrating and remembering. He claimed that he could longer concentrate on anything more than short paragraphs when reading and stated his mind constantly went on tangents.

The ALJ called a vocational expert, Dr. McGowan, who testified at the hearing. The ALJ asked Dr. McGowan whether a hypothetical individual who is 58 years old, has 13 years of education, who is able to lift and carry up to 20 pounds occasionally, 10 pounds frequently; can stand or walk for six hours out of eight; sit for six hours out of eight; occasionally climb stairs and ramps; occasionally climb ropes, ladders, and scaffolds; and should avoid concentrated exposure to extreme cold and extreme heat could perform any of Claimant's past relevant work or work in the national economy. Dr. McGowan testified that Claimant could perform those jobs as they were described in the Dictionary of Occupational Titles, but that Claimant could not perform those jobs in the way that he performed them in the past. Dr. McGowan testified that while Claimant could perform as a marketing manager in the national economy, Claimant had previously performed the job as a marketing manager plus sales, which the hypothetical claimant would not be able to perform. The ALJ then asked Dr. McGowan whether a second hypothetical individual with the same background information as the first who would be able to lift and carry up to 20 pounds occasionally, 10 pounds frequently; stand or walk for two hours out of eight; sit for six; could occasionally climb stairs and ramps, never ropes, ladders and scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts and gases and the hazards of unprotected heights could perform any of Claimant's past relevant work or work in the national economy. Dr. McGowan replied that this hypothetical individual could perform only the job of marketing manager, as defined by the DOT, but not as Claimant performed it because he

worked as a marketing manager plus sales. Claimant's attorney then asked whether the second hypothetical individual, who also need to rest several hours per day, would be capable of performing any of the claimant's past relevant work or any jobs available in the national economy. Dr. McGowan testified that such a person would not be able to perform any of Claimant's previous work or any jobs nationally available.

<u>Testimony Before the ALJ on December 7, 2011</u>

Claimant testified that he has not worked since the date of the last hearing, and he is alleging disability beginning in June 2005. Delores Gonzalez confirmed Claimant's previous jobs to be a marketing manager, cable installer, photographer, door-to-door salesperson, alarm salesperson, communications or phone salesperson, and a cable salesperson. Claimant testified that he last worked as a sales manager at Cable Concepts. The job duties of the sales manager were the same as a door-to-door salesperson going door to door eight hours a day as well as gathering the work at the end of the day and taking the work to the cable office the next morning. Whenever he made a sale, Claimant was in charge of completing installation. Installation would require him to strap on a fifteen pound tool belt and carry the roll of cable weighing thirty to forty pounds. Claimant stopped working at Cable Concepts after he started experiencing severe chest pains in June 2005.

Claimant had his first heart attack in 1997 and after starting to experience severe chest pains in June 2005, he had procedures done in July 2005and August 2006, and then he had some EECP treatments. Claimant testified that the first EECP treatment at the end of 2006 helped for three to four months but the next treatment in May 2008 helped for half that time. After his last catheterization in August 2010, his doctor told Claimant that his arteries were blocked, and there

was nothing else that could be done without hurting the bypass surgery results.

Claimant experiences chest pain every day one to three times a day on average for the last three years. He takes nitroglycerin to alleviate the pain. Lifting anything weighing over five pounds or walking four of five steps brings on his chest pain. Claimant noted that stress high or low temperatures can also trigger the chest pain. When he experiences the chest pain, Claimant stops whatever he was doing and takes a nitroglycerin tablet. If the pain does not subside in a couple of minutes, Claimant takes another nitroglycerin tablet. Although he has not had to take three nitroglycerin tablets in a couple of years, Claimant explained that when this has occurred, he goes directly to the emergency room. After his chest pain subsides, Claimant feels exhausted.

Claimant testified that his fatigue has increased since the first hearing. He cannot walk without holding onto something. Claimant cannot walk through Wal-Mart without stopping and resting. He feels tired all of time with some days better than others. Some days he feels like sitting around, because he cannot do anything. Claimant indicated this has been the case before December 31, 2009. Anything he does physically whether it be walking or lifting causes problems with shortness of breath.

Claimant receives treatment at the VA Hospital for emotional problems. He has been diagnosed with severe depression and PTSD, and he has been placed in therapy which helps. Claimant takes medications, attends group therapy every two weeks with Vietnam veterans, and sees his therapist every two to four weeks. Claimant sees a psychiatrist every four months. Claimant explained that the PTSD causes him to cry at a drop of a hat when he sees anything about Iraq, Afghanistan, or Vietnam.

Claimant has problems with concentration and memory. He cannot concentrate on one

activity for more than fifteen minutes. Claimant's ability to deal with stress had improved the last four years due to his medications. When he is under physical or mental stress, Claimant starts to experience chest pains as well as pain in his back, neck, and jaw. Claimant has to sit down and rest and take nitroglycerin if the chest pain persists. His last test showed his diabetes to be in the normal range. Claimant attributed his test results to improving his diet. He uses a CPAP machine to sleep because of obstructive sleep apnea. Claimant testified that he needs ten to twelve hours of sleep at night to function. He typically naps for one hour each day.

In the morning, it takes Claimant an hour and a half to shower and take his medications. During an eight-hour time period each day, Claimant spends two to three hours either napping or resting. He cannot make it through the day without napping and resting. Claimant cannot walk more than two to three minutes before he has to stop and rest. Claimant used to be able to walk for one hour at a very slow pace. Claimant can stand for fifteen minutes before he has to change positions. Claimant can sit for one hour if his feet are elevated, but he has to get up and move around. If his feet are down, Claimant can sit for fifteen minutes. Claimant vacuums the house once a week, one room at a time.

Claimant testified that he can no longer go to Florida, because it is too hot. He used to go on fishing trips every June. He last visited Florida in March 2010. Claimant has assisted in remodeling his basement by putting screws in the drywall with the assistance of others lifting and holding the drywall. Claimant tries to keep his mind occupied with four to five little projects. Since the last hearing, there has not been any period of time he can go without resting each day.

The ALJ questioned Claimant about his reporting to the VA in July 2009 how he denied having shortness of breath, no complaint of fatigue, and some chest pain within the last week

which quickly resolved.  In August 2010, the ALJ noted how Claimant reported to Dr. Fagan

doing quite well until recently.  Claimant explained he was doing better in relationship to where he

had been on previous times.

Vocational Expert, Delores Gonzalez, a vocational rehabilitation counselor, testified in

response to the ALJ's questions.  (Tr. 814-16, 936-39).

The ALJ asked Ms. Gonzalez to assume

A hypothetical claimant age 58 alleged date of onset, 13 years of education, the
same past work experience.  In this hypothetical this hypothetical claimant can
perform a full range of sedentary work.  If that is the case can this hypothetical
claimant return to any past relevant work?

(Tr. 814-15).[1]  Ms. Gonzalez opined "[t]he only job would be as a marketing manager as it's

generally performed in the national labor market."  (Tr. 815).  Ms. Gonzalez cited the DOT to be

163.167-018, classified as sedentary, skilled work.  The ALJ next asked if the hypothetical

claimant was limited to simple work then that job would not be applicable.  Ms. Gonzalez agreed

with the ALJ.  Ms. Gonzalez testified that her answers had been consistent with the DOT and the

Selected Characteristics of Occupations.

Claimant's counsel asked Ms. Gonzalez to assume

if an individual would require rest periods in excess of the two fifteen-minute and
typical thirty minutes for lunch and that these rest periods would be unscheduled,
they wouldn't be at a particular time, would such an individual be able to perform
any jobs that exist in significant numbers in the national economy on a sustained
basis?

(Tr. 815).  Ms. Gonzalez responded no, "because the person would need to be accommodated

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 5/filed April 5, 2012).

and therefore would not be able to work competitively." (Tr. 815).

Next counsel asked Ms. Gonzalez to assume

Likewise, if an individual would have say chest pains at unpredictable times over the course of a work week and they would occur maybe more than once or twice a week requiring the person to separate from the workstation and rest for a period of time, would this also be incompatible with the ability to perform any substantial gainful activity?

(Tr. 816). Ms. Gonzalez responded yes inasmuch as this would cause the person to be off task.

(Tr. 816).

<u>Medical Records</u>

The first medical record is dated July 08, 2005, and indicates that Claimant had a history of coronary artery disease with myocardial infarction. In 1997, Claimant underwent open-heart four vessel coronary artery bypass surgery. His status-post recent stent placement had features of metabolic syndrome, non-Insulin dependent diabetes mellitus, as well as known hypertension and hyperlipidemia. Budo had been observed to snore heavily and had a long history of recurrent nocturnal arousal and increasing drowsiness. The initiation of CPAP improved Budo's sleep quality. He was given a Thallium Stress Test and attained 88% of his maximum predicted heart rate, but the test was prematurely terminated due to leg fatigue and moderately severe shortness of breath. The diagnosis was negative for angina and ischemia and the doctor noted a somewhat reduced capacity in physical conditioning. Furthermore, Claimant was given a US Doppler Cartoid Complete Exam, which found minimal plaque within the distal right common cartoid artery extending into the carotid bifurcation and minimal atherosclerotic plaque within the distal left common carotid artery extending into the carotid bifurcation. The doctor noted antegrade flow in both vertebral arteries. PA and lateral views of the chest showed that the cardiac

silhouette was at its upper limits of normal to mildly enlarged with aortic atherosclerosis and

poststernotomy coronary bypass changes.  Dr. Reh noted mildly prominent interstitial markings

within the left perihilar and infrahilar regions without active or confluent infiltrates and

degenerative changes throughout the thoracic spine.

On July 20, 2005, Claimant underwent left heart catherization, selective right and left

coronary angiograms, left ventriculogram, selective sapehnous vein angiogram, free radial artery

graft angiogram, left internal mammary anteriogram, and PTCA of saphenous vein graft stenosis.

Dr. Manog K. Eapen noted that Claimant's left main artery had 50% diffuse disease, LAD had

70% diffuse disease, left circumflex was totally occluded at the proximal segment, ramus

intermedius was occluded at the proximal area with mild disease, and right coronary artery was a

dominant vessel and was totally occluded at the mid level, and the proximal stent had a 90%

diffuse stenosis.  Dr. Eapen recommended Plavix 75mg daily for six months, Aspirin 81mg daily,

adjunctive medical treatment, as well as regular exercise and diet program.  In the discharge

instructions, Dr. Reh restricted his lifting to no more than ten pounds for one week.

On August 29, 2005, Claimant underwent sleep analysis at the Sleep Studies Center at St.

Joseph Hospital.  Dr. Kirk E. Flury, the treating physician, noted that Claimant showed evidence

of severe sleep disordered breathing with nearly continuous obstructive apnea/hypopnea, 95

obstructive apneas, 19 obstructive hypopneas, and the apnea/hypopnea index scored at 47 events

an hour.  Dr. Flury recommended the initiation of a CPAP, which actually improved Claimant's

sleep during the analysis.

On January 20, 2006, Claimant underwent Dual Isotope Stress Test and Nuclear Imaging.

Budo completed 7 minutes and 29 seconds of treadmill exercise achieving a cardiac workload of

10.1 METs and the predicted exercise time based on Budo's age and activity was 8 minutes and 30 seconds. His peak heart rate was 134, which was 83% of his age predicted maximum. Claimant complained of dull pain in chest prior to exercising and his vitals and symptoms returned to baseline approximately four minutes into recovery. The nuclear imaging test indicated mildly decreased activity along the inferior portion of the left ventricle.

Claimant underwent a chest x-ray on April 26, 2006, which indicated mild cardiomegaly with aortic atherosclerosis and post sternotomy coronary bypass changes.

On May 04, 2006, Dr. Leonard Fagan, Claimant's treating cardiologist, advised Claimant to "take it easy" as a result of recurring symptoms of chest pain.

On May 11, 2006, Claimant was taken to the emergency room and records indicate that he felt tired, had difficulty breathing, felt cold, complained of a stiff neck, and had a fluttering feeling in his chest. Claimant underwent the following procedures: left heart catheterization, coronary arteriography, left ventriculogram, graft study, IC-NTG given for coronary vasospasm, and successful stenting of the distal segment of vein graft to the circumflex. Dr. Michael G. Goldmeier found that left main had diffuse plaquing with an ostial 35% stenosis and the patient had significant diffuse disease in the native distal circumflex after the vein graft touchdown that is not amenable to percutaneous intervention.

Claimant underwent a Dual Isotope Stress Test and Nuclear Imaging on August 22, 2006. Claimant completed seven minutes of treadmill exercise achieving a cardiac workload of 10 METs (predicted exercise time based on Claimant's age and activity was 9 minutes). His peak heart rate was 105, which was 65% of age predicted maximum. The test was limited by symptoms of shortness of breath and fatigue. The nuclear imaging showed mildly decreased activity along the

inferolateral portion of the left ventricle, though the defect appeared to be reversible between stress and rest imaging.  As a result of this test, Dr. Fagan diagnosed new ischemia in the region of known disease.

Records further indicate that on August 30, 2006, Claimant underwent left heart catheterization, coronary arteriography, graft study times three, balloon dilatation of the distal posterolateral circumflex via the vein graft, and was given IC-NTG for coronary vaspospasm.  Dr. Goldmeier concluded: 1) Coronary angiography demonstrates high-grade native three-vessel disease (old and unchanged); 2) The graft study demonstrated that all grafts are patent; and 3) Successful balloon dilatation of the distal anastomosis, decreasing the 60-80 percent stenosis down to 30-60 percent residual.

Dr. Fagan issued a letter on May 04, 2007, which stated that Claimant has been on maximal medical therapy and continues to experience chest discomfort with exertion, relieved with sublingual nitroglycerin, and has been using nitroglycerin prophylactically with activities that may precipitate symptoms.  He had been experiencing increased fatigue and decreased energy for several weeks prior to the date of the letter.  Dr. Fagan issued a letter on May 10, 2007 which indicated that Claimant has advanced coronary artery disease who is status post revascularization and a recent course of external enhanced counter pulsation ("EECP") treatments for refractory angina.

Dr. Fagan completed the Physician's Assessment for Social Security Disability Claim on June 05, 2007, and noted Claimant has coronary artery disease and angina, chronic which were stable with minimal activity.  Additionally, Dr. Fagan opined that "patient should refrain from any physical exertion."  Dr. Fagan stated that Claimant's endurance was affected by his impairments,

but he did not answer how many hours in an eight hour workday Claimant would need to rest. Dr. Fagan noted that Claimant was disabled from cardiac standpoint in response to the question of whether patient's condition would prevent him from engaging in sustained full time employment.

Advanced Practice Nurse Barbara S. Latal assessed Claimant as having Major Depression on July 20, 2007. She noted that Claimant sleeps for 11-12 hours if he does not set an alarm and recommended that he set an alarm so that he sleeps no more than 10 hours in a night. She further recommended that Claimant limit his naps to one-half hour in the morning and/or afternoon. She recommended that Claimant continue to take Buproprion and Trazodone. Furthermore, Dr. Fagan saw Claimant on July 20, 2007 after he complained of chest discomfort that awakened him in the middle of the night and required two sublingual nitroglycerine doses for relief. Despite this episode, Claimant stated that he felt that he had been using fewer nitros since going on 500mg of Ranexa. Dr. Fagan increased Claimant's dose of Ranexa from 500mg to 1000mg daily.

Dr. Reh completed the Physician's Assessment for Social Security Disability Claim on August 31, 2007. He noted that Claimant suffers from chronic stable angina, coronary artery disease--post myocardial infraction and coronary artery bypass graft--hypertension, and non-insulin dependent diabetes mellitus (NIDDM). Dr. Reh stated that Claimant tired quickly with exertion, sleeps a lot, and that Claimant would need to rest for several hours of each day in an 8 hour workday. He concluded that Claimant's condition would prevent him from working at any employment. The Progress Notes attached to the assessment show Dr. Rey's course of treatment of Claimant from January 20, 2006 to June 7, 2007, but such records are devoid of any recommendation by Dr. Reh requiring Claimant to rest for several hours each day or finding Claimant's condition preventing him from working.

On October 09, 2007, Dr. Fagan described in a letter that Claimant had recurrent anginal symptoms since January 2007. His anginal symptoms increased and he was begun on Ranexa, which was titrated up to 1000 mg bid (sic) with resolution of many of his symptoms. Dr. Fagan recommended that Claimant remain on both aspirin and Plavix long term.

Dr. Fagan completed the Supplemental Physician's Assessment for Social Security Disability Claim on January 25, 2008 and wrote that Claimant had refractory angina pectoris and was totally disabled from a cardiac standpoint. He further explained that despite maximal therapy, Claimant still experienced chest pain. Claimant still had frequent chest pain and sometimes took as many as 4-5 sublingual nitroglycerine doses per day. Claimant also underwent a 30 minute medication evaluation due to the onset of crying spells and noted stress related to his settling his deceased brother's life insurance and worrying about his mother's ability to survive financially.

Dr. Reh completed the Supplemental Physician's Assessment for Social Security Disability Claim on February 6, 2008 and wrote that Claimant's medical conditions prevents him from engaging in sedentary work due to his heart condition and that he is fatigued on a daily basis. Dr. Reh noted how Claimant would need to rest several hours each day. Also on this date, Claimant missed a dose of Renexa and began having chest pains, which sublingual nitroglycerine did not alleviate. He drove himself to the fire station and they took him by ambulance to St. Joseph's Hospital. After being given a dose of Renexa, he felt better and all blood tests came back normal.

Claimant received treatment for chest pain and discomfort in the emergency room at St. Joseph Hospital on February 6, 2008. Claimant reported the pain lasting for ninety minutes starting just prior to arrival and resolving upon arrival in the emergency room. Claimant had run out of his Ranexa that day and was on his way to have the medication refilled when he

experienced the abrupt onset of moderate pain and relieved by nitroglycerin given by the paramedics.

Claimant received treatment from Psychologist Sarah S. Shia, PhD on February 27, 2008. Dr. Shia treated Claimant for depression and stress management, noting that he felt more stable since last treatment, but that his depression oscillates. He was unable to manage when several issues arise at once. Also on this day, Claimant's LDL levels were elevated and he admitted that he was only taking one-half of his recommended dose of Zocor. Dr. Madhuri Subbaiah advised him to take the entire recommended dose.

On May 19, 2008, Claimant completed the last of 35 EECP treatments, according to a letter from EECP Technician Laurie Sandler to Dr. Fagan. Ms. Sandler noted in the letter that Claimant's energy level was good and he felt good. Claimant reported experiencing much improvement during course of EECP treatment and using nitroglycerin before running in the house or working in the yard. Additionally, Dr. Karen Cowan completed a psychiatric examination of Claimant and noted that Claimant had multiple psychiatric interventions throughout his life. He reported symptoms consistent with post-traumatic stress disorder after tour in Vietnam, which included anger, depression, increased anxiety, flashbacks, nightmares, increased startle response, and hypervigilence. His depressive symptoms were classic with low mood, hopelessness, thoughts of suicide, which were worse a few years ago but he had no such thoughts at that time. While he had problems sleeping, change in appetite, decreased motivation, low energy, and increased anxiety, there were no psychotic, manic, panic, or other symptoms to report at that time. Dr. Cowan noted in her report that Claimant was working for Ridgeway Insurance Group and Aflac attempting to sell insurance at the time she made her report. She

further noted that Claimant smoked cigarettes on occasion.

On June 25, 2008, Dr. Reh noted Claimant feeling better and losing weight.

On July 22, 2008, Dr. Cowan noted that Claimant was being treated for Post-Traumatic Stress Disorder and Depression. She stated that Claimant had been feeling worse over the past month, which included problems sleeping, low energy, anhedonia, problems concentrating, and increased anxiety about memories of Vietnam. He felt that he may have been better off dead, but he denied any thoughts of suicide.

In the September 12, 2008 Progress Note, Claimant reported exercising for thirty minutes each day and having recent round of EECP therapy which helped him some. Claimant is feeling much better and able to walk thirty minutes without problems.

Dr. Herbert Lomax, a PhD at VAMC, treated Claimant from September 12, 2008 through August 4, 2010 for PTSD. Claimant reported being exposed to at least three traumatic experiences during his service in Viet Nam. Dr. Lomax summarized the themes of therapy to include false, self-blame, depression, and flashbacks. Dr. Lomax noted Claimant to have "a history of agitated emotional outbursts and reported on one occasion his wife witnessed him with a gun in his mouth." (Tr. 1256). Claimant expressed anxiety about his upcoming evaluation for possible VA pension benefits for PTSD.

In a letter to Dr. Reh dated September 30, 2008, Dr. Fagan wrote that Claimant's chronic angina was prompting him to occasionally use sublingual nitroglycerine prophylactically prior to walking for thirty minutes 4-5 times per week. Furthermore, Dr. Fagan noted the following impressions: 1) Coronary artery disease status post coronary bypass grafting and status post EECP–his angina pattern had increased; 2) Hyperlipidemia; 3) Diabetes; 4) Hypertension; and 5)

Obstructive sleep apnea.

Claimant underwent a Adenosine Dual Isotope Stress Test and Nuclear Imaging on October 03, 2008. The report shows that doctors unsuccessfully attempted to stent the distal branch of the vein graft to the circumflex artery. In May 2006 the distal branch was dilated by balloon angioplasty and he eventually underwent a repeat cardiac catherization in May 2006 with stenting of the distal vein graft. The report notes that he continued to have symptoms of chest pressure and underwent external enhanced counter pulsation and continued to have a crescendo anginal pattern. Claimant began the test and using standard Bruce protocol and walked for one minute and forty-four seconds. This represented a MET of less than 4 and his heart rate rose to 97, which was 60% of his age predicted maximum. The test was limited by shortness of breath, which rendered Claimant unable to complete the test. There were no arrhythmias and the test was switched to the adenosine stress test receiving 82mg of adenosine infused over 8 minutes and 16 seconds using standard infusion technique with the patient in an incumbent position. Claimant experienced chest pain during the test, which subsided when given sublingual nitroglycerine. The nuclear imaging showed no evidence of ischemia.

In the January 22, 2009 progress note, Dr. Reh noted Claimant's CAD to be stable.

On March 2, 2009, Dr. Reh continued management of his cardiovascular disease and noted his symptoms of exertional angina and dyspnea to be stable and ordered him to continue his medications.

Claimant received treatment in the emergency room at St. Clair Health Center after falling when stepping down off a porch and injuring his hand and rib. Claimant reported no chest pain or shortness of breath. Claimant refused taking any pain medication inasmuch as he wanted to be

able to drive home.

In a follow-up visit on June 5, 2009, Claimant reported feeling better since last year's completion of EECP therapy and walking up to one hour three to four times a week. In the June 5, 2009 letter to Dr. Reh, Dr. Fagan noted how he treated Claimant in routine follow up for his coronary artery disease status post coronary bypass grafting with chronic angina. (Tr. 1332). Claimant reported feeling better since completing EECP therapy last year, walking for up to an hour three to four times a week, and some recent back pain occurring after digging in his yard.

Claimant was treated for post-traumatic stress disorder from September 22, 2008 to July 23, 2009 by Dr. Herbert Lomax. Dr. Lomax noted that Claimant was actively participating in a PTSD group, which consisted of problem-solving intervention, approximately every two weeks. In a progress note dated March 16, 2009, Dr. Lomax wrote that psychotropic medications and psychotherapy have helped him to move from "feelings of being stuck" to increased optimism, improved quality of life and the hope of recovery.

In a follow-up visit on July 29, 2009, Dr. Reh noted Claimant's angina to be stable.

On October 28, 2009, Dr. Reh treated Claimant's CAD in a routine follow-up visit. Dr. Reh explained how losing weight would help Claimant.

Claimant attended group therapy sessions every two months from October 2, 2008 through July 29, 2011, and actively participated in the PTSD Group. On September 12, 2008, Claimant reported having enough energy to walk for thirty minutes without problems. On May 7, 2009, Claimant reported making home improvements. On May 21, 2009, Claimant reported spending more time with friends and considering other activities. On July 6, 2009, Claimant reported being better compliant with his diabetes medications and also exercising.

On January 6, 2010, Claimant reported an increase in the frequency of his chest pain over the past several months requiring sublingual nitroglycerin two to three times a week. Claimant has difficulty walking and poor dietary habits. Dr. Fagan encouraged Claimant to work harder on his diet and changed his medications. During an office visit, Dr. Reh noted Claimant denied having chest pains and shortness of breath. Dr. Reh encouraged Claimant to lose weight.

Claimant reported having a few episodes of chest pain each day on January 6, 2010 in his visit for management of cardiovascular disease. Dr. Reh noted his angina gradually worsening and continued his medication regimen.

On April 7, 2010, Dr. Reh treated Claimant for CAD, and Claimant reported not having symptoms and intermittently exercising. Dr. Reh encouraged him to lose weight.

In a routine follow-up treatment on July 9, 2010 for his chronic angina, Dr. Fagan noted Claimant called last month reporting worsening chest pain. Dr. Fagan added allopurinal 300 mg. Claimant reported doing remarkably well since that time with the frequency of his angina reduced from once a day to once a week. Dr. Fagan discussed limitations to Claimant's activities and recommended he return in six months for treatment.

On August 4, 2010, Dr. Michael Goldmeier performed a repeat diagnostic cardiac catheterization and noted Claimant had done quite well clinically until recently when he started experiencing recurrent chest discomfort crescendo pattern requiring repeat nitroglycerin sublingual for relief. Dr. Goldmeier questioned whether the complete shutdown of the vein graft is the cause of Claimant's anginal symptoms.

In a follow-up visit on September 2, 2010, Claimant reported having lack of stamina and some somnolence and fatigue, but his angina to be much improved. Dr. Fagan noted his CAD to

be stable and have improved since last seen and continued his current medication regimen.

On November 24, 2010, Dr. Reh noted Claimant's current symptoms of CAD to be none, and he was not experiencing radiating pain, only shortness of breath. Dr. Reh noted Claimant needs to lose weight.

In a "To Whom It May Concern" letter dated April 1, 2011, Dr. Fagan states Claimant "is a patient under my care for coronary artery disease, s/p coronary artery bypass graft surgery, s/p myocardial infraction and s/p coronary angioplasty of the vein graft stenosis to the ramus intermedius and obtuse marginal. He has undergone EECP treatments. He has refractory angina despite maximal medical therapy and is considered totally disabled from a cardiac standpoint." (Tr. 1015). In the progress note, Claimant reported his chronic angina to be stable and occurs with exertion three to four times a week and resolves with rest and one nitroglycerin tablet. Claimant started walking on a treadmill at a slow pace for twenty minutes without pain.

In a "To whom it may concern" letter dated April 5, 2011, Dr. Reh noted that Claimant suffers from atherosclerotic heart disease, coronary disease, and long standing insulin dependent diabetic as well having hypertension and complaints of chest pain. Dr. Reh opined Claimant "has been and continues to be unable to work at any job...." (Tr. 1017).

In the August 1, 2011 Physician's Assessment for Social Security Disability Claim, Dr. Fagan confirmed the current diagnosis of CAD with symptoms including angina with daily activity on maximum medication. Dr. Fagan opined that Claimant would have to rest more than one time each hour. Dr. Fagan noted that "[p]atient continues to experience refractory angina that prevents any employment and this has been present before June 25, 2008." (Tr. 1309). In the progress note, Dr. Fagan noted "[d]espite maximal medical therapy his symptoms persist and

surprisingly he was not accepted for disability." (Tr. 1310).  Dr. Fagan opined he supports Claimant's "total disability dating back before 2008." (Tr. 1312).  Dr. Fagan noted that he would consider EECP again if necessary.

In the August 12, 2011 Assessment for Social Security Claim, Dr. Herb Lomax opined that Claimant's "condition might have had negative result in his ability to work before Dec. 31, 2009. (Tr. 1344).

In the September 5, 2011 Physician's Assessment for Social Security, Dr. Reh noted Claimant cannot work at all, and Claimant's "symptoms have not abated nor improved." (Tr. 1350, 1353).

In the September 15, 2011 Progress Note, the treating doctor suggested Claimant try physical exercise such as walking, swimming, or calisthenics as strategies to assist him in weight loss.  Claimant attributed his weight gain to boredom, eating too much, poor food choices and habits, and insufficient physical activity, and his barriers to physical activity being difficulty with self control, hungry all the time, and love to eat.  Claimant reported his current physical activity levels to be twenty to twenty-nine minutes of moderate activity five times a week and ten to nineteen minutes of vigorous activity one day a week.  Claimant reported his dislike of exercise, daily routine of not including exercise, back problems, and medical limitations as barriers to increasing his physical activity.  In an earlier visit, when offered a weight management program in a group setting, Claimant expressed no interest.

<u>Legal Standard</u>

A court's role on review is determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.

2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the Administrative Law Judge's conclusion. <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000) (quoting <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

<u>Brand v. Secretary of Dep't of Health, Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his relevant past work. If the claimant can perform his relevant past work, he is not disabled.

At this stage, if the claimant demonstrates that he has an impairment or combination of impairments that do not meet or equal an impairment listed in the regulations but which preclude him from performing his last regular work, the burden shifts to the Commissioner to show the

existence of some other type of work that an individual with the claimant's impairments is capable of performing.  Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997); Butler v. Secretary of Health & Human Services, 850 F.2d 425, 426 (8th Cir. 1988).  If the claimant has solely exertional impairments, the ALJ may apply the Medical-Vocational Guidelines contained in 20 C.F.R., Subpart P, Appendix 2, to meet this burden.  Foreman, 122 F.3d at 25.  However, when significant nonexertional limitations exist, the ALJ must call a vocational expert to testify to the existence of jobs that a person with the claimant's impairments is capable of performing.  Id. at 26; Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987).

If the claimant cannot perform his relevant past work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See, e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors;  (4) the claimant's daily activities; (5) the dosage, effectiveness, and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

<u>The ALJ's Findings</u>

Considering his age, education, work experience, and residual functional capacity, the ALJ found that Claimant was not disabled prior to August 4, 2010, but he became disabled on that date and has continued to be disabled through the date of the decision.

He issued the following specific findings:

1.    Claimant met the insured status of the Social Security Act through December 31, 2010.

2.    Claimant has not engaged in substantial gainful activity since June 30, 2005, the alleged onset date. 20 C.F.R. § 404.1520(b).

3.    Claimant has the following severe impairments: residuals of bypass surgery and coronary artery disease. 20 C.F.R. § 404.1520(c). His non-severe impairments are depression, post-traumatic stress disorder, obesity, diabetes mellitus, and sleep apnea.

4.    Since the alleged onset date of disability, Claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1. 20 C.F.R. § 404.1520(d).

5.    Prior to August 4, 2010, Claimant had the residual functional capacity to perform the full range of sedentary work. 20 C.F.R. § 404.1567(a).

6.    Beginning on August 4, 2010, Claimant has the residual functional capacity to perform less than sedentary work. 20 C.F.R. § 404.1567(a).

7.    Prior to August 4, 2010, Claimant was capable of performing past relevant work as a marketing manager. This work did not require the performance of work-related activities precluded by Claimant's residual functional capacity. 20 C.F.R. § 404.1565.

8.    Beginning on August 4, 2010, Claimant's residual functional capacity has prevented him from being able to perform past relevant work. 20 C.F.R. § 404.1565.

9.      Claimant is an individual closely approaching retirement age on August 4, 2010, the established disability onset date.    20 C.F.R. § 404.1563.

10.     Claimant has at least a high school education and is able to communicate in English.  20 C.F.R. § 404.1564.

11.     Claimant does not have any work skills that are transferrable to other occupations with the residual functional capacity defined above.   20 C.F.R. § 404.1568.

12.     Since August 4, 2010, considering Claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that Claimant can perform.  20 C.F.R. §§ 404.1560(c); 404.1566.

13.     Claimant was not disabled prior to August 4, 2010, but he became disabled on that date and has continued to be disabled through the date of this decision.  20 C.F.R. §§ 404.1520(f), (g).

Discussion

As previously mentioned, when reviewing a denial of Social Security benefits, a court must determine whether there is substantial evidence on the record as a whole to support the ALJ's decision.  42 U.S.C. § 405(g); Gowell, 242 F.3d at 796.  Claimant raises three issues on appeal from the final determination denying disability.  First, Claimant claims that the ALJ failed to properly consider the opinion evidence proffered by his two treating physicians, Drs. Reh and Fagan.  More specifically, Claimant argues that the ALJ played doctor inasmuch as he made his own independent medical finding that the objective evidence did not appear to preclude sedentary work.  Second, Claimant argues that the ALJ failed to address the conflicting testimony by the vocational experts regarding his ability to perform his past relevant work of marketing manager plus sales.  Finally, Claimant argues that the ALJ failed to consider all of his severe medically determinable impairments.

Residual functional capacity is what the claimant can still do despite his or her physical or

mental limitations. 20 C.F.R. pt. 404.1545(a); <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000). Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional" because a claimant's residual functional capacity is a medical question. <u>Lauer</u>, 245 F.3d at 704.

A.    <u>Weight Given to Treating Doctors</u>

Claimant claims that the ALJ failed to properly consider the opinion evidence proffered by his two treating physicians, Drs. Reh and Fagan. More specifically, Claimant argues that the ALJ played doctor inasmuch as he made his own independent medical finding that the objective evidence did not appear to preclude sedentary work.

When considering professionals' opinions, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." <u>Ellis v. Barnhart</u>, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. pt. 404(a)(2).) A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that it does not automatically control, since the record must be evaluated as a whole. The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations

where other medical assessments are supported by better or more thorough medical evidence or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. Prosch v. Apfel, 201 F.3d at 1013 (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to always give good reasons for the particular weight the ALJ chooses to give. Singh, 222 F.3d at 452.

The undersigned finds that the ALJ considered the opinions of Drs. Reh and Fagan but found for the period before August 2010, such opinions were not due controlling weight, and the substantial evidence on the records supports these findings.

As the ALJ acknowledged in his decision, Drs. Reh and Fagan were Claimant's treating physicians. In the June 2007 assessment, Dr. Fagan found Claimant to be disabled from a cardiac standpoint with his only restriction being that Claimant should refrain from any physical exertion. In the January 2008 assessment, Dr. Fagan opined that Claimant was disabled. In the August 2011 assessment, Dr. Fagan clarified his earlier opinions and stated that Claimant would need to rest frequently, more than once per hour, and he had daily angina despite maximum medications concluding that Claimant has been prevented from any employment since January 25, 2008. In the August 31, 2007 assessment, Dr. Reh opined that Claimant would need to rest for several hours of each day in an 8 hour workday, and his condition would prevent him from working at any employment. In the February 6, 2008 supplemental assessment, Dr. Reh wrote that Claimant's medical conditions prevent him from engaging in sedentary work due to his heart condition and that he is fatigued on a daily basis and would need to rest several hours each day. In the September 5, 2011 assessment, Dr. Reh noted Claimant cannot work at all, and his

"symptoms have not abated nor improved."  A review of the record shows that there are no treatment notes from the dates of the assessments showing Drs. Reh or Fagan examined Claimant or completed any testing on those days, and none of the earlier treatment records contain any objective evidence of limitation of the degree set forth in the assessments.

"A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

Title 20 C.F.R. § 404.1527(d) list six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6).  Consideration of these factors supports the ALJ's decision not to give greater weight to the disability determination of Dr. Onik.

First, to the extent Drs. Reh and Fagan opined that Claimant is disabled, a treating

physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ acknowledged that Drs. Reh and Fagan were treating sources, but that their opinions were not entitled to controlling weight because they were not well-supported by medically acceptable clinical and laboratory techniques and are inconsistent with their prescribed medical treatment. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Moreover, a brief conclusory letter from a treating physician stating that the applicant is disabled is not binding. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature.").

The ALJ acknowledged that Drs. Reh and Fagan were a treating sources, but that their opinions were not entitled to controlling weight, because they were not well-supported by medically acceptable clinical and laboratory techniques. The undersigned notes no examination notes accompanied the assessments. Indeed, the Progress Notes attached to the August 31, 2007 assessment show Dr. Rey's course of treatment from January 20, 2006 to June 7, 2007, but such records are devoid of any recommendation by Dr. Reh requiring Claimant to rest for several hours each day or finding Claimant's condition preventing him from working. Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir.

1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

Second, Dr. Reh and Fagan's assessments are inconsistent with their treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in their treatment notes Drs. Reh and Fagan never set forth any specific limitations on physical activity. Indeed, prior to August 4, 2010, Claimant reported exercising daily, and his symptoms being well controlled with Ranexa and EECP treatments.

The ALJ considered that Claimant's treating physicians did not impose limitations on him resulting from his alleged disabling impairments, coronary artery disease and the residuals of bypass surgery. See Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a lack of significant medical restrictions is inconsistent with complaints of disabling pain). As such, the undersigned finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the case law and Regulations.

Next, upon failing to give controlling weight to the opinions of Drs. Reh and Fagan, the

ALJ considered that the doctors' opinions did not include any clinical test results, nor did they include observations or any findings as a basis upon which their determinations were made. Indeed, both doctors opined that Claimant was unable to work. "A medical source opinion that an applicant is 'disabled"or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data.); see also 20 C.F.R. § 404.1527(e).

The ALJ considered that the assessments did not include any clinical test results, nor did it include observations or any findings as a basis upon which their determinations were made. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotations marks omitted). The opinions and findings of the plaintiff's treating physicians are entitled to "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data.

Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as a whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by an explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician;'s opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.").  Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record."  1996 WL 374188, *2 (S.S.A. July 2, 1996).  As such, the undersigned finds that the AlJ properly considered Drs. Reh and Fagan's failure to reference clinical results, observations, or findings as a basis upon which their determinations were made and that their decisions in this regard are not supported by substantial evidence.

Upon failing to give controlling weight to Drs. Reh and Fagan's opinion, the ALJ considered that their conclusions were inconsistent with their own treatment notes, which did not report any findings of significant limitations or findings of inability to work. Where a treating physician's notes are inconsistent with his RFC assessment, controlling weight should not be given to the RFC assessment. Hacker, 459 F.3d at 937. Indeed, on May 19, 2008, Claimant completed the last of 35 EECP treatments, according to a letter from EECP Technician Laurie Sandler to Dr. Fagan, and she noted that Claimant's energy level was good and he felt good, and Claimant reported experiencing much improvement during course of EECP treatment and using nitroglycerin before running in the house or working in the yard. On June 25, 2008, Dr. Reh noted Claimant feeling better and losing weight. In a letter to Dr. Reh dated September 30, 2008, Dr. Fagan wrote that Claimant's chronic angina was prompting him to occasionally use sublingual nitroglycerine prophylactically prior to walking for thirty minutes 4-5 times per week.

On March 2, 2009, Dr. Reh continued management of his cardiovascular disease and noted his symptoms of exertional angina and dyspnea to be stable and ordered him to continue his medications. On June 5, 2009, Claimant reported feeling better since last year's completion of EECP therapy and walking up to one hour three to four times a week. Dr. Fagan noted how he treated Claimant in routine follow up for his coronary artery disease status post coronary bypass grafting with chronic angina, and Claimant reported feeling better, walking for up to an hour three to four times a week, and some recent back pain occurring after digging in his yard.

In a follow-up visit on July 29, 2009, Dr. Reh noted Claimant's angina to be stable. On April 7, 2010, Dr. Reh treated Claimant for CAD, and Claimant reported not having symptoms and intermittently exercising. On July 9, 2010, Claimant reported doing remarkably well since that

time with the frequency of his angina reduced from once a day to once a week and Dr. Fagan discussed limitations to Claimant's activities and recommended he return in six months for treatment.

The ALJ also considered that the opinions of Drs. Reh and Fagan were inconsistent with other evidence of record. The ALJ noted that Claimant reported being able to remodel his basement, including the installation of drywall, and to travel to Florida. Prior to August 4, 2010, Claimant reported being able to exercise daily such as walking for thirty minutes without problems. On June 5, 2009, Claimant reported feeling better since completing EECP therapy, walking for up to an hour three to four times a week, and some recent back pain occurring after digging in his yard. On September 12, 2008, Claimant reported having enough energy to walk for thirty minutes without problems. On May 7, 2009, Claimant reported making home improvements. On July 6, 2009, Claimant reported being better compliant with his diabetes medications and also exercising. On April 7, 2010, Dr. Reh treated Claimant for CAD, and Claimant reported not having symptoms and intermittently exercising. On September 15, 2011, the treating doctor suggested Claimant try physical exercise such as walking, swimming, or calisthenics as strategies to assist him in weight loss. Claimant attributed his weight gain to boredom, eating too much, poor food choices and habits, and insufficient physical activity, and his barriers to physical activity being difficulty with self control, hungry all the time, and love to eat. Claimant reported his current physical activity levels to be twenty to twenty-nine minutes of moderate activity five times a week and ten to nineteen minutes of vigorous activity one day a week. On November 24, 2010, Dr. Reh noted Claimant's current symptoms of CAD to be none, and he was not experiencing radiating pain, only shortness of breath.

The ALJ noted how Dr. Diemer found in July 2006 that Claimant's cardiac condition appeared to be stable, and opined that Claimant had the residual functional capacity to perform light work. The record shows the ALJ considered his opinion to be generally consistent with the record but records after August 4, 2010 showed Claimant to have greater limitations. Accordingly, the ALJ found Claimant to have the residual functional capacity to perform work at the sedentary exertional level up to August 3, 2010, as supported by the medical records showing intermittent angina well controlled with medication. On August 4, 2010, Dr. Michael Goldmeier performed a repeat diagnostic cardiac catheterization and noted Claimant had done quite well clinically until recently when he started experiencing recurrent chest discomfort crescendo pattern requiring repeat nitroglycerin sublingual for relief.

The undersigned finds upon considering the assessments of Drs. Reh and Fagan, the ALJ evaluated the record as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996)) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole."). The ALJ articulated reasons for not giving controlling weight to the assessments of Drs. Reh and Fagan. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as it is not supported by any detailed, clinical diagnostic evidence). Further, the undersigned finds that substantial evidence on the record as a whole supports the ALJ's findings regarding the weight he gave to the opinions of Drs. Reh and Fagan. The undersigned additionally finds that substantial evidence supports the ALJ's findings in regard to

the severity of Claimant's alleged impairments.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.        Severity of Claimant's Mental Impairments

Claimant argues that the ALJ failed to consider all of his severe medically determinable impairments. In particular, Claimant notes that at Step 2 of the sequential evaluation, the ALJ found he did not have severe mental impairments. The ALJ opined that his "mental impairments do not significantly limit his ability to perform basic work activities, and are therefore not severe.... His continuing treatment generally concerned dealing with financial difficulties." (Tr. 784-85).

As noted above, Claimant is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months and which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinic and laboratory diagnostic techniques." Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987).

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby v.

Astrue, 500 F.3d 705, 707 (8th Cir. 2007); 20 C.F.R. § 404.1521(a). Under the regulations, the ALJ evaluates the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration persistence, or pace; and (4) episodes of decomposition. Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008); 20 C.F.R. § 404.1521a(c)(3). If the ALJ rates the claimant's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe - unless the evidence indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities. 20 C.F.R. §1520a(d)(1).

Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id.

In his application for disability benefits, Claimant alleged disability due to coronary artery disease, advanced stable angina, non-insulin dependent diabetes, depression, and post-traumatic stress disorder. The ALJ found Claimant's coronary artery disease and the residuals of bypass surgery to be severe impairments and concluded that the impairments, alone or in combination, are not of listing level. The Social Security regulations define a nonsevere impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. See 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing,

hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521(b), 416.921(b).  In finding Claimant's mental impairments not to be a severe impairments, the ALJ determined that the mental impairments did not have more than a minimal impact upon the his ability to engage in basic work-related activities such that it did not satisfy 20 C.F.R. §§ 404.1521 and 404.921.

Based on the objective medical evidence, the ALJ determined Claimant's mental impairments not to be a severe impairments, and the undersigned finds that substantial evidence supports the ALJ's determination.  The undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979).  This is so even when the medical evidence is in conflict.  Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical evidence is equally balanced, ... the ALJ resolves the conflict.").  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

As noted above, Claimant is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months and which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinic and laboratory diagnostic techniques." Brown v. Shalala, 15 F.3d 97, 98 (8th Cir. 1994).  An impairment or combination of impairments is severe if it "significantly

limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). It is the claimant's burden to establish that an impairment is severe. Id.

While Claimant was diagnosed with PTSD, the mere presence of a mental disturbance is not disabling per se; rather a claimant must show a severe functional loss establishing an inability to engage is substantial gainful activity. See Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental disturbance is not disabling per se, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity).

The undersigned concludes that the ALJ's decision is supported by substantial evidence. A review of the record shows that the ALJ found Claimant's mental impairments to be non-severe inasmuch as Claimant improved with treatment, and his GAF[2] ratings (between 65 and 70) indicated only mild problems. The largely normal examination findings support the ALJ's conclusion that Claimant's impairments would impose only mild functional restrictions. See Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1994) (the mere presence of a mental disturbance is not disabling per se, absent a showing of severe functional loss establishing an

---

[2]Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

inability to engage in substantial gainful activity,). Further, the ALJ noted how Claimant reported

that the medications were effective, and he successfully participated in PTSD counseling sessions.

Conditions which can be controlled by treatment are not disabling. See Gates v. Astrue, 627

F.3d 1080, 1082 (8th Cir. 2010) ("The medical record supports the conclusion that any

depression experienced by [claimant] was situational in nature, related to marital issues, and

improved with regiment of medication and counseling) (citing Banks v. Massanari, 258 F.3d 820,

826 (8th Cir. 2001) (finding depression not severe under similar circumstances)); Schultz v.

Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by

treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir.

2002); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition

that can be controlled by treatment is not disabling).

Likewise, the record shows that many of Claimant's problems were related to situational

issues such as limited financial resources, anxiety about upcoming evaluation for possible VA

pension benefits for PTSD, or family situations, and these type of conditions are not disabling. A

condition which is situational cannot be the basis for finding a claimant disabled. Situational

depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001)

(holding that depression was situational and not disabling because it was due to denial of food

stamps and workers compensation and because there was no evidence that it resulted in

significant functional limitations).

The ALJ also noted that although Claimant reported PTSD stemming from his service in

Vietnam, he did not seek treatment for PTSD until September 2008 at the time he was applying

for VA pension benefits and three years after his alleged onset date of disability. See e.g., Page v.

Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (holding that the ALJ properly considered that the claimant did not assert disability due to a mental impairment on her application; that she claimed to hear and see things at the administrative hearing; and that subsequent to the hearing the claimant self referred for mental health counseling). Seeking limited medical treatment is inconsistent with claims of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988) (holding that failure to seek aggressive treatment is not suggestive of disabling pain). The medical record supports the ALJ's determination that Claimant's mental impairments to be not severe. Accordingly, the objective medical evidence on the record shows Claimant's mental impairments to be non-severe.

Further, the ALJ noted that Claimant was able to successfully work for decades after returning from Vietnam. See, e.g. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work). The medical record is devoid of any evidence showing that Claimant's mental condition had deteriorated or precluded him from working in the past. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (claimant not considered disabled when claimant worked with an impairment over a period of years absent significant deterioration). The record shows that Claimant was awarded only 10% service connected benefits due to PTSD. The ALJ found that

Claimant's depression and PTSD did not cause more than mild limitation in his ability to perform work-related abilities. Accordingly, this claim is without merit inasmuch as substantial evidence supports the ALJ's decision not to consider mental impairments to be severe medically determinable impairments..

The undersigned may reject the ALJ's decision only if it is not supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is that which "a reasonable mind might accept as adequate" to support the Commissioner's conclusion. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993). The Court may not substitute its own judgment or findings of fact when reviewing the record for substantial evidence. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

C.           Testimony from Vocational Experts

Claimant argues that the ALJ failed to address the conflicting testimony by the vocational experts regarding his ability to perform his past relevant work of marketing manager plus sales.

At Step Four, the ALJ must consider whether the claimant retains the RFC to perform his past relevant work, either as the claimant actually performed the work or as the work is performed generally throughout the national economy. Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007). If the claimant is able to perform either the specific work previously done or the same type of work as generally performed, the claimant is not disabled. Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000). In determining whether the claimant can perform his past relevant work as he actually performed it, "[t]he ALJ must ... make explicit findings regarding the actual physical and mental demands of the claimant's past work." Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999). The ALJ found Claimant not disabled because he retained the RFC to perform his past

relevant work as a marketing manager until August 2010. Accordingly, the ALJ found at step four that Claimant was not disabled within the meaning of the Act.

If the claimant can perform past relevant work, he is not disabled. Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994). An ALJ may rely on vocational expert testimony as substantial evidence to determine a claimant may return to past relevant work. See Wildman v. Astrue, 596 F.3d 959, 969-70 (8th Cir. 2010) (holding that vocational expert testimony and a proper RFC constituted substantial evidence for an ALJ to determine claimant could return to past relevant work). The record contains substantial evidence to support the ALJ's conclusion that Claimant could return to past relevant work and is therefore not disabled under the Act. Once a court has found that there is substantial evidence of the record as a whole to support the ALJ's decision concerning a claimant's disability, the five-step analysis need go no further. Lewis v. Barnhart, 353 F.3d 642, 648 (8th Cir. 2003).

At both hearings, the vocational experts' testimony showed that the job of marketing manager was a sedentary type job as that job was performed in the national economy, although as performed by Claimant, the job may have required more exertion. The ALJ found the testimony to be consistent with the Dictionary of Occupational Titles ("DOT"). Thus there is no inconsistency between the job as identified by the vocational expert and the DOT inasmuch as the record shows that the job is a sedentary job as performed in the national economy. See DOT § 163.167-018.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED.**

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  5th  day of March, 2013.